CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JONATHAN U. LEE (CABN 148792)
WENDY M. GARBERS (CABN 213208)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Jonathan.Lee@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:23-CR-00191-AMO-2 |
| Plaintiff, | **SENTENCING MEMORANDUM OF THE UNITED STATES** |
| v. | |
| DEMARCO BARNETT, ET AL, | Date: June 2, 2025 |
| Defendants. | Time: 2:00 p.m. |

## TABLE OF CONTENTS

I.     INTRODUCTION................................................................................................1

II.    OFFENSE AND RELATED CONDUCT ...........................................................2

A.     The Charges......................................................................................................2

B.     The Robberies...................................................................................................3

       1.     March 2022 Robbery.............................................................................3

       2.     November 2022 Robbery.......................................................................4

       3.     December 2022 Robbery.......................................................................7

C.     Uncharged Conduct.........................................................................................9

       1.     Burglary of Audi Oakland on November 24, 2022..............................9

       2.     C.R.A.F.T. robbery ...............................................................................9

D.     Ghost Town gang membership......................................................................10

III.   CRIMINAL HISTORY ....................................................................................12

IV.    VICTIM IMPACT AND RESTITUTION .......................................................13

A.     Victims............................................................................................................13

       1.     Coin store robbery...............................................................................13

       2.     Jewelry store robbery...........................................................................13

       3.     Marijuana business robbery.................................................................14

B.     Restitution ......................................................................................................15

       1.     Coin store robbery...............................................................................15

       2.     Jewelry store robbery...........................................................................15

       3.     Marijuana business robbery.................................................................15

V.     SENTENCING GUIDELINES CALCULATIONS .........................................15

VI.    APPLICABLE LAW .........................................................................................16

A.     Sentencing Framework...................................................................................16

B.     Conspiracy, Aiding and Abetting, and Robbery Affecting Interstate Commerce
Framework..................................................................................................................17

VII.     SENTENCING RECOMMENDATION ...................................................................18

A.      Nature of the offense.........................................................................................18

B.      Need for deterrence............................................................................................20

C.      History and characteristics of the defendant.....................................................21

VIII.    CONCLUSION......................................................................................................23

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**Cases**

4

5

*Ortiz-Magana v. Mukasey*,
6
   542 F.3d 653 (9th Cir. 2008)..................................................................................... 17

7
*Young v. United States*,
   22 F.4th 1115 (9th Cir. 2022)..................................................................................... 17
8

9
*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008)..................................................................................... 16

10
*United States v. Dominguez*,
11
   954 F.3d 1251 (9th Cir. 2020), *cert. granted, judgment vacated*, 142 S. Ct. 2857 (2022) ................. 17

12
*United States v. Escalante*,
   637 F.2d 1197 (9th Cir. 1980)................................................................................... 17
13

14
*United States v. Green*,
   523 F.2d 229 (2d Cir. 1975)..................................................................................... 17

15
*United States v. Henry*,
16
   984 F.3d 1343 (9th Cir.), *cert. denied*, —— U.S. ——, 142 S. Ct. 376, 211 L.Ed.2d 200 (2021)....... 17

17
*United States v. Jones*,
   678 F.2d 102 (9th Cir. 1982)..................................................................................... 17
18

19
*United States v. Joseph*,
   No. 19-169767, 2022 WL 850036 (9th Cir. Mar. 22, 2022) ........................................... 17

20
*United States v. Kearney*,
   560 F.2d 1358 (9th Cir. 1977)................................................................................... 17
21

22
*United States v. Knight*,
   No. 21-10197, 2023 WL 34698 (9th Cir. Jan. 4, 2023), *cert. denied*, 143 S. Ct. 2478 (2023) ........... 17
23

24
*United States v. Montgomery*,
   384 F.3d 1050 (9th Cir. 2004)................................................................................... 18

25
*United States v. Perry*,
   550 F.2d 524 (9th Cir. 1997)..................................................................................... 17
26

27
*United States v. Romero*,
   282 F.3d 683 (9th Cir. 2002)..................................................................................... 18

28

*United States v. Sannicandro*,
    434 F.2d 321 (9th Cir. 1970)...................................................................... 17

*United States v. Thomas*,
    586 F.2d 123 (9th Cir. 1978)...................................................................... 18

## Statutes

18 U.S.C. § 924(c)(3)(A)................................................................................ 17

18 U.S.C. § 1951 ..................................................................................... 2, 10

18 U.S.C. § 3553(a)........................................................................................ 16

18 U.S.C. § 3553(a)(2).................................................................................... 16

# I.     INTRODUCTION

On June 2, 2025, the Court will preside over the sentencing hearing for defendant Demarco Barnett, who has pled guilty to Counts 1-4 of the Second Superseding Indictment.  In sum, Mr. Barnett admitted that he entered into a criminal partnership with eight other Ghost Town gang members to commit violent armed robberies across the Bay Area.  The first charged robbery was in San Francisco in March 2022, the second was in San Pablo in November 2022, and the third was in Oakland in December 2022.  The Grand Jury indicted Mr. Barnett in June 2023, and he pled guilty in December 2024.

The violent nature of the offense conduct is well-documented.  Harrowing videos show the co-conspirators' violent intrusion into the San Pablo and Oakland victim businesses.  The San Pablo videos include audio, which captures the co-conspirators' angry commands to gain control over the occupants and the screams of at least one victim in response.  The video clips of the interview with one of the San Francisco victims in the immediate aftermath of that robbery depict the trauma those events brought to his life.  The government also provides memoranda from the investigation to further document the violence involved and the losses of the victims.  By continuing in this violent conspiracy over the course of several months, Mr. Barnett caused harm to communities and individuals across the Bay Area.

The community and the victims have waited for nearly two years to see justice done in Mr. Barnett's case.  The government recommends a sentence of 126 months imprisonment.  This sentence will hold Mr. Barnett accountable for the violent conduct of his criminal partnership and it will further the community's interest in deterring Mr. Barnett or any other like-minded individual from engaging in this violent armed conduct.  The recommended sentence also recognizes Mr. Barnett's acceptance of responsibility, which he communicated through his counsel in early 2024, by reducing the government's recommended term of imprisonment by 25% below the sentencing guideline range calculated by the parties.  When compared to the guideline range calculated by the Probation Department, the recommended sentence represents an even greater reduction of at least 33% below the low end of the range.

The government also requests a restitution order of at least $309,738, a term of supervised release with the special search condition, and forfeiture.

1

## II.    OFFENSE AND RELATED CONDUCT

2

### A.    The Charges

3    The Second Superseding Indictment charged nine defendants in a conspiracy to commit

4    violations of 18 U.S.C. § 1951.  There are four counts relating to the conspiracy: Count 1 charges

5    Conspiracy to Engage in Robbery Affecting Interstate Commerce; Count 2 alleges Robbery and Aiding

6    and Abetting Robbery Affecting Interstate Commerce relating to a March 2022 robbery in San

7    Francisco; Count 3 alleges Robbery and Aiding and Abetting Robbery Affecting Interstate Commerce

8    relating to a November 2022 robbery in San Pablo; Count 4 alleges Robbery and Aiding and Abetting

9    Robbery Affecting Interstate Commerce relating to a December 2022 robbery in Oakland.  The chart

10    below summarizes the charges relating to the conspiracy against each of the nine defendants.

11

| Count No. | Charged Offense | Defendants Charged |
|---|---|---|
| One | Conspiracy to Commit Robbery Affecting Interstate Commerce, March 18, 2022, through January 26, 2023, in violation of 18 U.S.C. § 1951 | Jenkins<br>**Barnett**<br>Rabon<br>Smith-Stewart<br>Burrell<br>Garcia<br>Garnett<br>Hutchinson<br>Joseph |
| Two | Hobbs Act Robbery and Aiding and Abetting Hobbs Act Robbery on March 18, 2022 (Robert Johnson Stamp & Coin Company, San Francisco) in violation of 18 U.S.C. § 1951 | Jenkins<br>**Barnett**<br>Garnett<br>Joseph |
| Three | Hobbs Act Robbery and Aiding and Abetting Hobbs Act Robbery on November 12, 2022 (H Bee Jewelry Store, San Pablo) in violation of 18 U.S.C. § 1951 | Jenkins<br>**Barnett**<br>Rabon<br>Garcia<br>Hutchinson |
| Four | Hobbs Act Robbery and Aiding and Abetting Hobbs Act Robbery on December 24, 2022 (Joyus Wellness, Oakland) in violation of 18 U.S.C. § 1951 | Jenkins<br>**Barnett**<br>Rabon<br>Smith-Stewart<br>Burrell<br>Garcia<br>Garnett |

27

28    Defendant Barnett pleaded guilty to all four counts.  Plea Agreement, ECF No. 199.

B.     **The Robberies**

1.     **March 2022 Robbery**

In the PSR, the Probation Department described this robbery in paragraphs 12-14.  The report states that "[o]n March 18, 2022, Barnett, Jenkins, and two co-conspirators robbed the Robert R. Johnson Coin & Stamp Company store located on the 10th floor of the Hearst Building in San Francisco.  They used a Nissan Armada vehicle bearing stolen license plates as the getaway vehicle. The plates had been stolen from a 2014 Honda Coupe, and the Nissan Armada was rented by Jenkins from Enterprise on March 15, 2022. The coin store was operated by K.B., and his son, E.B., was also working in the store on the day of the robbery.  Barnett and two of the co-conspirators entered the coin store, while Jenkins waited in the vehicle. Barnett and his two co-conspirators demanded money from K.B. and E.B. and brandished firearms. E.B. was struck in the head with the firearm multiple times and had his hands zip-tied to restrain him. Barnett and his co-conspirators took E.B.'s wallet and cellphone and took K.B.'s wallet, cellphone, and keys. They then demanded that K.B. open one of the store safes, from which they stole at least $95,000 worth of jewelry, coins, and bills. Barnett and his co-conspirators then exited the store and fled in the Nissan Armada with Jenkins.  Photos were later discovered on Jenkins' phone of pocket watches that matched the description of those that were stolen in the robbery."

In the plea agreement, Mr. Barnett admitted his participation in this robbery.  He admitted that he entered the coin store with two co-conspirators.  He admitted that his co-conspirators brandished firearms at the store owner and his adult son.  He admitted that they used threats of violence and actual violence against the two victims, by brandishing the firearms, zip-tying Victim 2's hands, and striking Victim 2 in the head.  He admitted that he and his co-conspirators took jewelry and coins valued at more than $95,000 from the coin store, then rejoined their fourth co-conspirator in a getaway car they equipped with a stolen license plate before returning to a location in Oakland where they met before the robbery.

There is no surveillance video available from inside the coin store.  The surveillance video from the building lobby shows the three co-conspirators who entered the coin store and committed the robbery.

SENTENCING MEMORANDUM
CASE NO. CR 23-191 AMO                    3



2.  **November 2022 Robbery**

The PSR describes this robbery at paragraphs 15-18: "On November 12, 2022, Barnett, Jenkins, and other co-conspirators robbed the H Bee Jewelry Store in San Pablo. They were familiar with the store because they had been customers of the store for some time, and as such, they knew the layout of the store and were familiar with the owner. The group arrived in two getaway cars, each bearing stolen license plates. Five co-conspirators, including Barnett and Jenkins, entered the store to commit the robbery, while two co-conspirators waiting outside in the getaway cars. At least three of the co-conspirators were armed, including Jenkins. During the robbery, firearms were brandished towards the employees. The group took bags of jewelry, worth at least $95,000. After committing the robbery, Barnett, Jenkins, and the other co-conspirators reentered the getaway cars and fled the scene. After the robbery, Barnett wore pieces of the stolen jewelry and had one piece of the stolen jewelry altered. For example, at a birthday party on December 22, 2022, Barnett wore jewelry that had been stolen in the robbery. Furthermore, on his Instagram account, Barnett posted pictures of himself wearing a "RIP MOJOTTI" necklace and rings that were stolen from H Bee Jewelry Store. A search warrant executed at Barnett's residence on January 26, 2023, resulted in the recovery of the "RIP MOJOTTI" necklace and other jewelry stolen from H Bee. Jenkins also wore pieces of the stolen jewelry after the robbery. At the same birthday party on December 22, 2022, Jenkins wore a "RIP DIDDYBOP" pendant and other

1    jewelry that had been stolen from H Bee Jewelry Store. Furthermore, on his Instagram account, Jenkins

2    posted pictures of himself wearing the "RIP DIDDYBOP" necklace and other jewelry stolen from H

3    Bee. These items were later recovered during a search warrant executed at Jenkins' residence on January

4    26, 2023."

5            In his plea agreement, Mr. Barnett admitted that he and his co-conspirators began planning the

6    robbery several months before it occurred, and they were familiar with the store and its layout because

7    they had been customers.  He admitted that he and his co-conspirators used stolen license plates on the

8    two getaway cars and communicated by phone and met in Oakland before the robbery.  He admitted that

9    he and his co-conspirators drove the two getaway cars to the rear exterior door and then used that door

10   to enter the store.  He admitted that firearms were brandished toward the store employees, that he and

11   the other co-conspirators took bags of jewelry valued at more than $95,000, and then they fled using the

12   two getaway cars to return to Oakland.  He also admitted that he wore pieces of the jewelry stolen in this

13   robbery and posted images of himself wearing the stolen jewelry on social media.  Those images are

14   included in this memorandum.

15           The government provided surveillance video from H Bee.  Exhibit D (duration 2:39) shows the

16   rear exterior door area and Mr. Barnett and his co-conspirators shoving the owner inside as they ransack

17   the business.  Exhibits E-H (aggregate duration is approximately 6 minutes) depict the interior of the

18   jewelry store.  These videos are vivid depictions of the coordinated actions of Mr. Barnett and his co-

19   conspirators.  Their demands and the screams of the elderly female victim are heard throughout.  The

20   robbery lasted approximately 1 minute, 35 seconds.  Exhibit D depicts the co-conspirators rapid

21   approach to the rear door of the business and their taking the jewelry inventory to the two getaway cars

22   while brandishing firearms.  Exhibits E, F, G, and H show the defendants' actions in pushing into the

23   business through the rear door, shouting commands and pointing firearms at the store's occupants while

24   putting some of them on the ground, and they show the elderly female victim retreating from the

25   defendants' while screaming in terror.  Exhibit F shows the conspirators pointing firearms at two

26   employees.  Exhibit H shows the patrons who were in the store, including a young child in a stroller, as

27   they flee the jewelry store despite having firearms pointed at them, too.  Screenshot images are below.

28

1

2

3

4

5

6

7

8

9

10



11

12

13

14

15

16

17



18

19

20

21

22

23

24

25



26

27

28



### 3. December 2022 Robbery

The PSR describes this robbery at paragraphs 19-20: "On December 24, 2022, Barnett, Jenkins, and four co-conspirators robbed Joyus Recreation and Wellness Group LLC, which was a marijuana nursery in Oakland. [Victim] A.P. was an independent contractor at Joyus and was working at the nursery at the time of the robbery. Barnett, Jenkins, and their co-conspirators arrived at the nursery in two getaway cars. As A.P. exited the nursery and attempted to enter his vehicle, two of the co-conspirators, wearing hoods and masks, approached A.P. at gunpoint, rifled through his pockets, and took his debit card, driver's license, cellphone, and $100 in cash. A.P. was verbally and physically directed through the business, at gunpoint, and was hit in the head with a firearm. A.P. had a laceration on his forehead as a result of being struck with the firearm. The other four co-conspirators, including Barnett, also entered the business to help conduct the robbery. The men demanded to know where the "budded weed" and "money" were and took a bag containing marijuana plant trimmings before fleeing in the getaway cars."

In the plea agreement, Mr. Barnett admitted he participated in the Joyus armed robbery. He admitted that he and his co-conspirators arrived at Joyus in two getaway cars and that when the Joyus worker exited and attempted to drive away in his vehicle, two of the co-conspirators approached the

victim at gunpoint, taking him back inside Joyus. Mr. Barnett admitted that he went inside the business with his co-conspirators, and he admitted that firearms were brandished at the victim, who was also hit in the head with a firearm. Mr. Barnett also admitted that the co-conspirators repeatedly demanded "budded weed" and "money" from the victim, and they took a bag containing marijuana plant trimmings before leaving Joyus in two getaway cars.

The security video at the premises shows the co-conspirators taking the victim out of his vehicle at gunpoint and using force to direct him throughout the premises for approximately 7 and ½ minutes before they flee through the front door. See Exhibits K-M of the Lee Declaration.









The video, at Exhibit M, shows A.P.'s bloody head wound, starting at approximately 10:12 of the video.

C.    **Underlying Conduct**

1.    **Burglary of Audi Oakland on November 24, 2022**

On November 21, 2022, co-defendant Smith-Stewart purchased an Audi at Audi Oakland near the Coliseum using a false identity and supporting documents. She gave $9,500 in cash as a down payment for the Audi. There was a male with her. When the salesperson put the cash in the safe, the male expressed interest in the safe and at one point tried to pick it up. Three days later, on November 24, 2022, at around 2:00 a.m. (Thanksgiving morning), the Audi dealership was burglarized and the safe was stolen. Cell phone data records show that Mr. Barnett and at least three of his co-conspirators in the charged robberies were present at the Audi Oakland premises at the time of the burglary. The phone records show that the group met at or near Danny Garcia's residence in Oakland before and after the burglary. This uncharged, coordinated conduct is evidence of the conspiracy charged in this case because it occurred within the relevant time period, involved members of the conspiracy, and followed the same pattern of coordinated movement before and after the crime.

2.    **C.R.A.F.T. robbery**

On August 6, 2022, multiple members of the conspiracy broke into the C.R.A.F.T. marijuana

1    dispensary in Oakland.  The victim reported loss of inventory with a value of at least $100,000.  The

2    owner of the dispensary came to the location and was accosted by one of the suspects, which caused the

3    owner to flee.  Co-defendants in this case are on scene per their cell phone location information.  This

4    robbery is probative of the conspiracy in this case.

5           **D.**      <u>**Ghost Town gang membership**</u>

6           Mr. Barnett is a longtime member of Ghost Town gang.  In response to a grand jury subpoena,

7    Alameda County Sheriff's Office provided classification information at Santa Rita Jail for Mr. Barnett:

> 8    [Mr.] BARNETT has been a documented gang associate with the Alameda
> County Sheriff's Department since 0/08/2011.  On 01/18/2023 the Ghost
> 9    Town gang member per OPD class note was added to Barnett's File and
> Association flag as well.  On 01/26/2023 BARNETT came into custody at
> 10   Santa Rita Jail under PFN: BIE069, during the intake interview admitted
> to classification intake deputies that he was a Ghost Town gang member in
> 11   good standings (sic).  Lee Declaration, Exhibit P.

12   According to the Sheriff's Department classification information, Mr. Barnett again confirmed in an

13   intake interview in August 2023, after his indictment in this case, that he was in Ghost Town and listed

14   two other gangs as enemies.  *Id*.  Santa Rita reported that Mr. Barnett had no gang-related tattoos.  *Id*.

15

16          Mr. Barnett's membership in Ghost Town is further supported by social media activity.

17          After the robbery, Barnett wore stolen jewelry while around his fellow Ghost Town gang

18   members.  For example, photos show him wearing some of the stolen jewelry during a birthday party of

19   a fellow Ghost Town gang member.

 

1        In an Instagram story dated December 24, 2022, shown on the left below, multiple hands are

2    seen wearing diamond-encrusted, gold, flashy jewelry. *See image on the left.* Barnett's Instagram

3    handle is tagged in the post (@gamegodloveme_31)—which also mentions Ghost Town twice (in a song

4    and in the caption) and displays the Ghost emoji and "rock on" hand symbol (similar to the hand symbol

5    of the Ghost Town gang). The two hands in the top of the photo are believed to be Barnett's. The San

6    Pablo store owner identified three of the rings as stolen from his store in November 2022. *See image on*

7    *the right.*

8

9

10

11

12

13

14

15

16     

17

18

19

20

21

22

23

24

25

26

27

28

SENTENCING MEMORANDUM
CASE NO. CR 23-191 AMO        11

1    Another Instagram post by another gang member, below, shows Mr. Barnett wearing the jewelry

2    (including the same ring) and standing next to other Ghost Town gang members with the caption "Ghost

3    town richest generation" and the "salute" emoji.



III.    **CRIMINAL HISTORY**

20    Mr. Barnett has an extensive criminal history. The Probation Department calculates his criminal

21    history score as 16, which makes his criminal history category VI.[1] Mr. Barnett has sustained seven

22    convictions, six of which were felony offenses. PSR ¶¶ 60-66. His offense conduct giving rise to the

23    felony convictions included firearms possession (PSR ¶¶ 60-61), theft (¶¶ 62-64, 66) and evading an

24    officer with injury to others (¶ 65). Mr. Barnett committed the offenses resulting in the multiple felony

25    convictions despite the escalating terms of imprisonment he received: 2 years in 2013 (¶62), 3 years in

26    2013 (¶63), and 6 years in 2016 (¶65).

---

[1] Mr. Barnett's criminal history category of VI was higher than the government's calculation of category V at the time of the calculated guideline range accounted for in the parties' plea agreement.

IV.    **VICTIM IMPACT AND RESTITUTION**

A.    **Victims**

The victims in this case suffered physical and psychological injuries at the hands of Mr. Barnett and his co-conspirators.  The government will recount the victims' experience in summary.

1.    **Coin store robbery**

There were two victims present during the March 2022 robbery of the coin store in San Francisco by Mr. Barnett and his co-conspirators.[2]  K.B., an immigrant from Europe who was in his early 70s at the time, was present with his adult son E.B., who was in his early forties.  K.B., whose description of the robbery was produced in discovery, stated that three suspects forced their way into the business by pushing open the front door.  All three were armed with firearms, wearing masks and gloves.  One suspect forced K.B. to sit in a chair, with the other two forced E.B. to the ground, tied him up, and hit him on the head.  K.B. said the suspect who stayed with him pointed a firearm at his head for the entirety of the robbery, telling K.B. that he was in charge.  His voice did not sound nervous or scared to K.B.  He then forced K.B. into the adjacent room where the other two had his son on the ground.  The suspect told K.B. that if he wanted for him and his son to live, he needed to open the safe.  K.B. opened the one safe that was still locked.  The suspects then took cash, coins, and watches.  One suspect told the other that the group only had 3-5 minutes before they needed to leave. Before leaving the coin store, the suspects took K.B. and E.B.'s wallets and cell phones.  One of the suspects pulled K.B.'s license out of his wallet, showed it to him, and told him that they know where the two victims live and warned them not to do anything stupid.  E.B. received treatment for his injuries at S.F. General Hospital.  K.B. went to Kaiser Hospital and received treatment for one week due to the injuries he received in the robbery.  Both K.B. and E.B. were traumatized by the robbery.  See Exhibit A to the Lee Declaration (interview of E.B. by SFPD).

2.    **Jewelry store robbery**

The victims inside the jewelry store included H.S. (the owner), Y.S. (his elderly mother), and another employee I.C., as well as customers who have not been identified.  Surveillance footage shows

---

[2] This summary of the coin store robbery comes from Exhibit B to the Lee Declaration.

1   the store owner closing the rear door, at which point five hooded and masked men enter the store

2   pushing through the same door. Lee Declaration, Exh. D.  The robbers point a firearm as H.S. as they

3   shove him inside the store.  Exhs. E, F, G.  One of the men pushes H.S. to the ground, yelling "Don't

4   fucking move! Don't fucking move! Stay down!"  Y.S. shrieks in fear as she backs up and then turns to

5   run to the front of the store.  Another man points a firearm towards the store's front, where customers,

6   including one with a young child, had been shopping.  Exh. H.  In another video, I.C. exits the toilet and

7   is met by a robber with a gun pointed at him.  Exh. F. At the same time, other robbers ransack the store,

8   taking approximately $300,000-$500,000 worth of jewelry from several different drawers, containers,

9   and safes, and then flee in two getaway cars.  The entire robbery took less than two minutes, but

10  continues to traumatize the victims.

11              3.    **Marijuana business robbery**

12          There was one individual present for this robbery, A.P., who described how the robbers

13  confronted him as he was leaving the Joyus premises.[3]  A.P. followed his standard practice for leaving

14  Joyus, which was to call a coworker J.A., who had access to the exterior video cameras, so he could give

15  A.P. the "okay" to leave.  A.P. went to his vehicle and started the engine when one of the robbers

16  appeared with a firearm pointed at A.P.  Other suspects also appeared and they got A.P. out of the

17  vehicle, and then they took his driver's license, debit card, cash and cell phone.  The suspects forced

18  A.P. back inside the business.  They led him by the back of his neck.  They asked him where the money

19  was repeatedly.  A.P. directed the suspects to the vault.  The suspects had A.P. lay down on the ground,

20  face down, and one of the suspects held him down with a foot.  Later, A.P. got to his feet and the

21  suspects took him to the immature marijuana plants area.  He told the suspects the business did not have

22  mature plants.  The suspects escalated their demands and tone.  One of them struck A.P. on the head

23  with the back of a gun.  The suspects acted with a sense of urgency.  They wore masks and hoods.  After

24  they took A.P. to an office area, kicking in the door to gain entry, A.P. heard them yelling about the

25  police and fleeing.  A.P. stayed on the ground until all the suspects left Joyus.  There were unauthorized

26  charges on his debit card in the following days, but his bank reimbursed him for those charges.  He

27

28
_____
        [3] This summary of the Joyus robbery comes from Exhibit N of the Lee Declaration.

bought a new cell phone.  He received treatment for his bleeding cut on his head, and he felt a bump in that area in the following days.  He also remains traumatized by the robbery.

**B.    Restitution**

The government requests that the Court order restitution for the victims in the following amounts, payable by Mr. Barnett, jointly and severally with the other defendants who in subsequent sentencing hearings are also culpable for these robberies.

**1.    Coin store robbery**

The victim estimates losses of approximately $300,000.  The government produced discovery documenting stolen coins and other inventory valued at $150,338.  See Exhibit C, Lee Declaration.

**2.    Jewelry store robbery**

The jewelry store estimated the loss at between $300,000 and $500,000.  The government produced discovery documenting losses of approximately $159,400.  See Exhibits I-J, Lee Declaration.

**3.    Marijuana business robbery**

The loss amount for this robbery is undetermined.  The quantity of marijuana trimmings had a quantifiable value, but the government has not received a loss estimate or other documentation.

**V.    SENTENCING GUIDELINES CALCULATIONS**

The government agrees with the United States Probation Department's Sentencing Guidelines calculation. PSR ¶¶ 25-57.  Specifically, the government agrees that Counts 1 and 2 group because they involve the same victims and two or more transactions connected by a common scheme or plan.  As a result, Group 1 is comprised of those two counts.  The government agrees that the defendant's Base Offense Level is 20; that 5 levels should be added for the use of firearms during the course of the robbery; that 2 levels should be added for the bodily injury suffered by the victims; that 2 levels should be added for the restraint of the victims, and 2 levels should be added for the loss of more than $95,000 but less than $500,000 in the robbery, for an adjusted offense level for Group 1 of 31.  The government agrees with the Probation Department's calculation for Group 2, which is the robbery at Count 3, giving rise to a Base Offense Level of 20, a 5-level increase for use of a firearm, and a 2-level increase for the loss amount, for an adjusted offense level of 27 for Group 2.  The government agrees with the Probation Department's calculation for Group 3, which is the robbery at Count 4, giving rise to a Base Offense

1    Level of 20, a 5-level increase for use of a firearm, and a 2-level increase for injury to a victim, and a 1-

2    level increase for theft of a controlled substance, for an adjusted offense level of 28 for this group. The

3    government agrees that the multiple count adjustment adds three units to the calculation as set forth in

4    paragraph 50. Therefore, using the greater of the adjusted offense levels, which in this case is 31, and

5    adding three units, yields a combined adjusted offense level of 34. After subtracting three units for

6    acceptance of responsibility, the total offense level in Mr. Barnett's case is 31.

7        An offense level of 31 with a Criminal History Category VI yields an advisory sentencing range

8    of 188 to 235 months of imprisonment.[4]

9                         **VI.    APPLICABLE LAW**

10    **A.    Sentencing Framework**

11        The Court should impose a sentence sufficient, but not greater than necessary, to reflect the

12    purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520

13    F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate

14    sentence by calculating the correct sentencing range under the Guidelines. *Id*. After determining the

15    appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive

16    reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Under 18

17    U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider

18    these factors applicable to this case, among others: 1) the nature and circumstances of the offense and

19    the history and characteristics of the defendant; 2) the need for the sentence imposed to reflect the

20    seriousness of the offense, to promote respect for the law, and to provide just punishment for the

21    offense; 3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; 4) the

22    need to avoid unwarranted sentence disparities among defendants with similar records who have been

23    found guilty of similar conduct; and 5) the need to provide restitution to any victims of the offense.

24

25

26

27        [4] Although it does not affect the government's recommendation, the Probation Department has
concluded that the sentencing enhancement for firearm possession should be +6 rather than +5, raising

28    the final adjusted interview by at least one point. With a one point increase, the guideline sentence will
be _____, if the Court accepts the Probation Department's analysis.

**B.    Conspiracy, Aiding and Abetting, and Robbery Affecting Interstate Commerce Framework**

Violations of Title 18, section 1951, sometimes referred to as Hobbs Act robbery, are a crime of violence. *See United States v. Knight*, No. 21-10197, 2023 WL 34698, at *2 (9th Cir. Jan. 4, 2023), *cert. denied*, 143 S. Ct. 2478 (2023), *citing United States v. Dominguez*, 954 F.3d 1251, 1261 (9th Cir. 2020), *cert. granted, judgment vacated*, 142 S. Ct. 2857 (2022), *and reinstated in part by* 48 F.4th 1040 (9th Cir. 2022) ("We reaffirm that Hobbs Act robbery is a crime of violence under 18 U.S.C. § 924(c)(3)(A)."). The same is true for the offense of aiding and abetting such a robbery. *United States v. Joseph*, No. 19-169767, 2022 WL 850036, at *1 (9th Cir. Mar. 22, 2022), citing *Young v. United States*, 22 F.4th 1115, 1122 (9th Cir. 2022) ("[T]here is no distinction between aiding-and-abetting liability and liability as a principal under federal law.")

An offender who aids and abets another offender if "treated as if they committed the offense as principals." *See United States v. Henry*, 984 F.3d 1343, 1356 (9th Cir.), *cert. denied*, —— U.S. ——, 142 S. Ct. 376, 211 L.Ed.2d 200 (2021) ("Defendants found guilty of armed bank robbery under ... [an] aiding-and-abetting theory are treated as if they committed the offense as principals."); *see also Ortiz-Magana v. Mukasey*, 542 F.3d 653, 659 (9th Cir. 2008) (stating that "aiding and abetting an [offense] is the functional equivalent of personally committing that offense"); *United States v. Jones*, 678 F.2d 102, 104 (9th Cir. 1982) (holding that "any person who aids or abets" a violation of § 2113 "is punishable as a principal"); *United States v. Sannicandro*, 434 F.2d 321, 324 (9th Cir. 1970) ("This circuit is committed to the view that whoever aids or abets the commission of an offense against the United States is punishable as a principal.").

Conspiracy to commit armed robbery is a criminal partnership to commit crimes of violence. See Ninth Cir. Criminal Jury Instruction 11.1. A person may be a member of a conspiracy even though the person does not know all of the purposes of or participants in the conspiracy. *United States v. Escalante*, 637 F.2d 1197, 1200 (9th Cir. 1980); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977). A single conspiracy can be established even though it took place during a long period of time during which new members joined and old members dropped out. *United States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975). *See also United States v. Perry*, 550 F.2d 524, 528 (9th Cir. 1997) (holding that law of conspiracy

1   does not require government "to prove that all of the defendants met together at the same time and

2   ratified the illegal scheme"); *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978) (holding that

3   proof that defendant "knew he was plotting in concert with others to violate the law was sufficient to

4   raise the necessary inference that he joined in the overall agreement"). "The agreement need not be

5   explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and

6   that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d

7   1050, 1062 (9th Cir. 2004) (*citing United States v. Romero*, 282 F.3d 683, 687 (9th Cir. 2002)).

8                    **VII.    SENTENCING RECOMMENDATION**

9           Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18

10  U.S.C. §3553(a), the government respectfully recommends that the defendant be sentenced to 126

11  months in prison, three years of supervised release, forfeiture, and full restitution. Such a sentence

12  would be sufficient, but not greater than necessary, based on the nature of the offense, the need for

13  deterrence, and the history and characteristics of the defendant. The recommended sentence accounts

14  for the aggravating sentencing factors while also balancing the mitigating factor of Mr. Barnett's early

15  acceptance of responsibility. While Mr. Barnett's criminal history category is the highest possible level,

16  and one level higher than the government calculated at the time of the plea offer (resulting in a greater

17  downward variance of 33%), the government's recommendation is unchanged.

18          **A.    Nature of the offense**

19          The nature of the offense conduct is extremely serious. This was a conspiracy to commit armed

20  robberies over several months. The three charged robberies occurred in three cities in three counties.

21  The victim businesses were small premises and local businesses. Each was located in an area where a

22  rapid robbery and departure were more easily completed. Mr. Barnett and his co-conspirators targeted

23  the victim businesses because they had valuable inventory – jewelry, coins, and marijuana. Their

24  motive was greed. Each of the robberies was a coordinated, violent takeover. The co-conspirators used

25  firearms to gain control of the premises. They pointed the guns at the victim employees, who were

26  placed in fear of their lives by this conduct. The co-conspirators used the guns to direct individuals

27  inside the businesses to be quiet, to lay down, to move to a location the robbers desired, all through

28  threat of force. In the March 2022 coin store robbery, the co-conspirators zip-tied the hands of the

younger, adult victim, and then they struck him in the head with a firearm. In the November 2022 jewelry store robbery, multiple co-conspirators pointed guns at the employees. A male employee was told to get on the ground with a gun at his head. An elderly female employee screamed as she retreated toward the front of the store, where two customers waited by the counter, as a co-conspirator pointed a handgun in their direction and yelled at them. A male employee opened the door to exit the toilet near the rear door, only to have a robber point a gun at him. In the December 2022 marijuana business robbery, the co-conspirators removed the victim employee from his vehicle at gunpoint and then directed him back into the premises. For several minutes they forced him to move throughout the premises at gunpoint. They forced him to sit down at gunpoint as they demanded he reveal the location of the marijuana. They struck him on the head, too. This was an organized and calculated use of firearms to show force and to use force. They showed that the firearms were not just for display--in two of the three robberies they struck a victim in the head with a firearm. The entire group of co-conspirators benefited. They gained control and committed the robberies in a short period of time, because they held victims at gunpoint. The use of the firearms to strike a victim also increased their control level and made complete compliance with their demands much more likely. The violence of this case is an aggravating factor.

Likewise, the coordination of the co-conspirators is an aggravating factor. This was a criminal partnership, and it was an effective one, executing multiple crimes over the course of several months. First, the manner and execution of the robberies involved advance planning and coordination. Each robbery targeted stores with cash-reserves or valuable items (marijuana dispensaries or jewelry/coins). Each was a takeover style robbery with co-conspirators filling pre-planned roles—including who would serve as the getaway driver and who would enter the business. This made the takeover more efficient and therefore more effective. Each robbery involved suspects dressed in disguises (relatively generic hoodies and masks) to conceal their identities. Each robbery involved the threatened use of firearms. Significantly, each robbery involved coordinated movement with the robbers meeting at or near Defendant Danny Garcia's apartment before and after the robbery. Second, location records and toll records show a coordination among the suspects before each robbery. Third, the getaway cars used during each robbery show the group planned the robberies in advance by coordinating their

1    transportation in a way to avoid detection.  In the coin store robbery, a co-defendant rented the getaway
2    vehicle in a false name and used a stolen license plate.  In the jewelry store robbery, both getaway cars
3    had stolen license plates. In the marijuana business robbery, a co-defendant used a rental vehicle while
4    another used a vehicle purchased with a stolen identity.  Fourth, there is evidence that the co-
5    conspirators scouted their robbery targets in advance.  For example, on the evening of the coin store
6    robbery in March 2022, Mr. Barnett and at least two co-conspirators visited the H Bee business in San
7    Pablo during business hours.  They then robbed H Bee a few months later in November 2022.  Fifth, the
8    cell site data shows the co-conspirators met at similar locations before each of the robberies—evidence
9    that indicates they met to plan their heists in advance.  They met at or very near Danny Garcia's
10   residence in Oakland.  Again, all of the members of the conspiracy benefited from this careful planning
11   and coordination.  The defendant who served as the getaway driver made the rapid takeover and speedy
12   departure possible.  That defendant's contributions made it more likely that another co-conspirator
13   would be emboldened to point a firearm at a victim or strike that victim with the firearm because each
14   co-conspirator knew of the plan to be quick about their business.  Because they operated as a criminal
15   partnership, each member of the conspiracy is culpable for the acts in furtherance of their agreement.
16   Here, Mr. Barnett participated in all three robberies.  He and co-defendant Jenkins are the two
17   defendants who are similarly situated in this way.  Mr. Barnett and Mr. Jenkins have the greatest
18   exposure under the guidelines as a result.

19         Finally, the nature of the conduct involves traumatic impacts on the victims.  The individuals
20   directly impacted by the defendants' criminal partnership to use violence to commit the robberies
21   include K.B. and E.B. at the San Francisco coin store, H.S., Y.S., and I.C. at the San Pablo jewelry store,
22   and A.P. at Joyus in Oakland.  The government understands that these victims have had continuing and
23   lasting adverse effects from the stress of the robberies, to say nothing of the physical injuries suffered
24   when the defendants roughly shoved and struck them.  It is also the case that these victims are frightened
25   of what they perceive as a risk of retaliation against them for participating in any way in this
26   prosecution, either by the defendants or other Ghost Town gang members.

27         **B.**    **Need for deterrence**
28         The need for deterrence in this case is an aggravating sentencing factor.  As for specific

1   deterrence, Mr. Barnett has multiple felony convictions.  He is in the highest criminal history category.

2   His history includes probation violations and a parole violation.  Yet he committed the armed robberies

3   in this case.  Mr. Barnett—whose gang moniker is "Whoday"—is an active member of the Ghost Town

4   criminal gang.  Oakland's Department of Violence Prevention has concluded that the Ghost Town gang

5   is among the three groups "responsible for the majority of group-driven violence" in Oakland, including

6   the gun violence that has exploded in recent years.[5]  The recommended sentence will protect the

7   community from Mr. Barnett's future offenses.

8           In addition, the need for general deterrence is high also.  The community has a strong interest in

9   curbing this violent conduct.  According to crime data, robberies involving the use of a firearm increased

10  in Oakland by 50% in 2023, the calendar year following the offense conduct in this case.  Lee

11  Declaration, Exhibit O.  Robbery crews using firearms to overwhelm small businesses is an ongoing

12  concern.  The victims in this case provided vivid descriptions of the fear and terror they experienced at

13  the hands of Mr. Barnett and his co-conspirators.  Small businesses run by individuals who live in the

14  community do not deserve to experience this conduct.

15          The recommended sentence will signal to like-minded individuals (and to Mr. Barnett) that the

16  Court does not tolerate this offense conduct and will impose serious consequences for those proven to

17  have committed similar conduct.

18          **C.    History and characteristics of the defendant**

19          Mr. Barnett is a 35-year-old native of Oakland who has an extensive criminal history, as noted

20  above, and is an active member of the Ghost Town gang.  Lee Declaration, Exhibit P.  The Probation

21  Department describes his childhood and upbringing as terribly abusive.  Mr. Barnett has a sibling, two

22  half-siblings, and two additional half-siblings who were shot and killed in 2007 and 2015, respectively.

23  Mr. Barnett is married to his high school sweetheart, since 2015, and they have two children.  Mr.

24  Barnett has an additional child from another relationship.  He is close to his three children, each of

25  whom was born before the offense conduct.

26

27          [5] *See* Oaklandside, "Oakland violence prevention efforts get boost from $6 million state grant,"

28  Aug. 2, 2022, https://oaklandside.org/2022/08/02/oakland-violence-prevention-efforts-get-boost-from-6-million-state-grant/ (last accessed 5/27/2025).

Mr. Barnett is a high school graduate, and he attended some college at Sacramento State. He reported being unemployed since graduation from high school in 2007. While unemployed, Mr. Barnett managed to possess valuable jewelry and cash. In December 2022, in photos posted on social media, he wore some of the valuable jewelry stolen in the charged November 2022 robbery.



In early 2023, Mr. Barnett was arrested for the August 2022 C.R.A.F.T. burglary in which close to $100,000 of cash and marijuana was stolen. In connection with that arrest, officers searched his residence and found jewelry stolen during the November 2022 San Pablo jewelry store robbery, along with $31,000 in cash.

Mr. Barnett's social media supports that he has also been involved in recent gun violence. On January 17, 2023, Mr. Barnett suffered four gunshot wounds and was dropped off at the hospital in a car displaying stolen license plates. Mr. Barnett was uncooperative with police regarding the perpetrators, location, and cause of the shooting. In a private January 23, 2023 conversation over Instagram, while



1  Mr. Barnett was presumably recovering from his wounds, someone named "C.O.D." tells Barnett "Man

2  that shit be scary too . . . rest build that muscle back up good to hear you fought back."  C.O.D. uses the

3  "rock on" hand symbol (again, a symbol resembling the Ghost Town gang symbol).  Mr. Barnett doesn't

4  dispute that characterization that he "fought back," and instead reaffirms that he would "fight to the end

5  brother."

6         Mr. Barnett's history and characteristics support the government's recommended sentence.  Mr.

7  Barnett's conduct shows that he will join in a violent robbery crew that uses gun-related violence to

8  terrorize small businesses.  The conduct is calculated and cruel, and it is inconsistent with how Mr.

9  Barnett will present at sentencing, namely a loving spouse and father.  While he no doubt is a loving

10  spouse and father, those connections have not been important enough to keep Mr. Barnett from engaging

11  in violent crime and bringing trauma to other families.

12         To his credit, Mr. Barnett has admitted his conduct and accepted responsibility for it.  The

13  government's recommendation, which amounts to a 33% reduction from the bottom end of the

14  applicable guidelines range, takes into account this early acceptance of responsibility.

15                                  **VIII.    CONCLUSION**

16         For the foregoing reasons, the United States respectfully requests that the Court impose a

17  sentence of 126 months of imprisonment, followed by a 36-month term of supervised release, with each

18  of the conditions set forth in the plea agreement, including the expanded search condition.  In addition,

19  the government requests the defendant be sentenced to forfeiture and restitution in an amount to be

20  determined but in any event no less than $309,738.

21

22  DATED:  May 27, 2025                              CRAIG H. MISSAKIAN
                                                       United States Attorney
23

24                                                     /s/*Jonathan U. Lee*

25                                                     _____
                                                       JONATHAN U. LEE
26                                                     Assistant United States Attorney

27

28